**Opinion issued July 9, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-23-00587-CV

_____

### LINDSEY NADINE WARNER, Appellant

### V.

### TRAVIS NEAL TROUTMAN, Appellee

---

**On Appeal from the County Court at Law No. 2**
**Galveston County, Texas**
**Trial Court Case No. 21-FD-0554**

---

## MEMORANDUM OPINION

Appellee Travis Neal Troutman sued Appellant Lindsey Nadine Warner for

dissolution of their marital relationship and for conservatorship of their minor son.

In two issues, Warner argues (1) the trial court erred by failing to make timely

findings supporting its deviation from the standard possession order as required by

Section 153.258 of the Texas Family Code, and (2) the trial court abused its discretion by requiring that her periods of possession over her minor son be continuously supervised by the Safe Program, Troutman, or an adult designated by Troutman because this limitation on her right to possession exceeds the level of restriction required to protect the best interest of the child.

We affirm the trial court's decree.

## Background

Appellee Travis Neal Troutman sued Appellant Lindsey Nadine Warner for dissolution of their marital relationship, for conservatorship of their minor son, L.G.T. ("Lance"), and to adjudicate that Troutman is not the father of Warner's other child, J.L.W. ("Jason"). The trial court signed temporary orders appointing Warner and Troutman as Lance's temporary joint managing conservators and awarding Warner the exclusive right to designate Lance's primary residence. The temporary orders awarded Troutman possession of and access to Lance in accordance with the Family Code's standard possession order ("SPO"). *See* TEX. FAM. CODE §§ 153.3101–153.316 (codifying terms of standard possession order); *see also id.* § 153.316 (setting forth general terms for every standard possession order); *Kazmi v. Kazmi*, No. 03-22-00330-CV, 2023 WL 7932473, at \*12 (Tex. App.—Austin Nov. 17, 2023, no pet.) ("The standard possession order sets the minimum possessory

2

rights of the parent who does not have the right to establish the child's primary residence.").

On September 23, 2021, Troutman filed an emergency motion for drug testing of Warner, which the court granted. Warner submitted a hair follicle sample which tested positive for amphetamine and methamphetamine. After Warner's positive drug test, Troutman filed a motion to modify the temporary orders. The trial court signed an agreed temporary order on November 22, 2021, naming Troutman and Warner as Lance's temporary joint managing conservators but giving Troutman the exclusive right to designate Lance's primary residence. Later, on December 16, 2021, the trial court signed an agreed order naming Troutman and Warner as Lance's temporary joint managing conservators and giving Troutman the exclusive right to designate Lance's primary residence. The temporary orders deviated from the SPO by denying Warner overnight periods of possession. The agreed order also gave Troutman the right to request that Warner submit to drug testing and stated that if Warner tested positive for any illegal substance, her right to possession of and access to Lance would be suspended until she tested negative for drugs and the results were sent to Troutman.

On March 9, 2022, Warner was arrested and charged with two counts of the felony offense of burglary of a building. And on March 22, 2022, Warner was arrested and charged with one count of the felony offense of unauthorized use of a

motor vehicle. That same day, Troutman filed an emergency motion to modify the temporary orders. The trial court held a hearing on Troutman's motion, which Warner did not attend.

On April 11, 2022, the trial court signed a "Default Order on Petitioner's Emergency Motion to Modify Temporary Orders, Request for Additional Temporary Orders, and Request for Expedited Hearing" modifying the December 16, 2021 agreed order. In the April 11, 2022 order, the court ordered that Warner and Troutman "shall have possession of the child at times mutually agreed to in advance by the parties, and, in the absence of mutual agreement," Warner and Troutman would have possession of Lance pursuant to the terms set forth in the order. Those terms deviated from the SPO by limiting Warner's right to possession of and access to Lance to two hours on the Saturday following the first, third, and fifth Friday of each month and requiring that all periods of possession by Warner "be supervised by Safe Supervised Visitation, (832)297-0013." Warner was ordered to enroll with Safe Supervised Visitation by no later than April 18, 2022, and to send email confirmation of her enrollment to Troutman, who was then required to enroll with Safe Supervised Visitation.

On March 28, 2023, Warner and Troutman entered into a partial mediated settlement agreement that resolved the division of the marital estate in the divorce and determined that Troutman was not Jason's father.

4

## Trial

The remaining issues of Lance's conservatorship and possession of and access to Lance were tried to the bench. Troutman, Warner, and Margaret Watson testified at trial.

### A. Troutman

Troutman testified that he was married to Warner and that Lance is their only child. Lance is six years old, and he attends kindergarten. Troutman testified that he and Warner entered into a partial mediated settlement agreement with respect to the division of the marital estate and he asked the court to approve the agreement and grant him and Warner a divorce on grounds of irreconcilable differences.

Troutman requested that the court appoint him as Lance's sole managing conservator with the exclusive right to designate Lance's primary residence. He also asked the court to order that Warner's periods of possession of Lance be supervised and that Warner continue to be subject to random hair follicle drug testing. Troutman explained that he wanted hair follicle testing, as opposed to urinalysis, because it was easier to cheat on a urinalysis test. When asked what concerns had arisen during the pendency of the case that led him to seek sole managing conservatorship of Lance, Troutman explained that where Warner lived during the pendency of the divorce proceeding, including when she had custody of Lance, was of concern to him and "obviously, the drug issue." Troutman also was concerned

about the possibility that Warner would engage in criminal activity "in the future when she's in possession of [Lance], based on" the three felony offenses she was arrested for while the case was pending.

On March 9, 2022, Warner was arrested and charged with two counts of the felony offense of burglary of a building. On March 22, 2022, Warner was arrested and charged with the felony offense of unlawful use of a vehicle. Warner was pregnant with Jason when she was arrested. Troutman testified that one of the charges of burglary of a building and unlawful use of a motor vehicle had been "dropped" and the other was "set for probation for, I believe, a couple of years." According to Troutman, nothing had changed since Warner was arrested for the three felony offenses that would alleviate his concerns about the possibility that Warner would engage in criminal activity in the future.

With respect to his concerns over Warner's past drug use, Troutman testified that he was concerned Warner would start using drugs again because "it's a habit and it might not be over." Troutman testified that Warner had tested positive for amphetamines and methamphetamine while the case was pending, and Warner has a history and pattern of using methamphetamine or amphetamines. When asked if he knew whether Warner had used methamphetamine or amphetamines in the past, Troutman testified that he had "suspected it." According to Troutman, it was in Lance's best interest for Warner to remain subject to random drug testing because

6

"[t]hat way I can have confidence that she's doing better and it's a safe environment for [Lance] to be around when she's with him." Troutman testified that he believed it was in Lance's best interest for Warner to seek rehabilitation therapy for her drug use and that would address some of his concerns.

Troutman also requested that Warner's periods of possession be supervised because he wanted "a little bit longer period of time of proof that she's been clean off of any type of drugs and that she has a stable job and stable home guaranteed for [Lance]." According to Troutman, Warner was currently residing with Robert and Margaret Watson, but he did not know whether that was an appropriate environment for Lance to spend the night because he did not know the Watsons. When asked if he had any concerns about drug use in the Watsons' home, Troutman testified that he knew people who had used drugs in the Watsons' home in the past and he was concerned that Lance might be exposed to drug use if he stayed in the Watsons' home.

Troutman testified that the April 11, 2022 order required Warner to register with Safe Supervised Visitation and he was not aware that Warner had ever done so. According to Troutman, Warner's failure to comply with the court's order concerned him because it "seems like a pretty simple request. If that can't get done, what else could get lost or not carried through?" When asked if he had concerns about allowing Warner to have a right to unsupervised possession of Lance, Troutman

testified that he was concerned that Warner "could potentially leave town." He also was concerned about allowing Warner to have possession of Lance outside of the Galveston area, including El Paso, Texas, where Warner was from. According to Troutman, El Paso is 12 hours away and if "something happens, I can't be there if he needs me." Troutman was also concerned that if Warner moved to El Paso, as she was planning to do, Warner would move in with or associate with "people that we both know are still using drugs." Troutman testified that it was in Lance's best interest for Warner to exercise her right to possession of Lance in Galveston County, or one of the surrounding counties because under those circumstances, it would not be "as big of a concern for his safety and well-being and it's extremely less likely for him not to be returned on time."

On cross-examination, Troutman testified that he met Warner when they were living in El Paso and they both used drugs while they lived there. Troutman tested positive for cocaine while at work and he was discharged from the Army after he was charged with driving while ability impaired. Troutman and Warner moved to Galveston County in 2014, and Lance was born in 2016. Troutman testified that he and Lance lived with Troutman's parents, who assisted with Lance's care. Troutman testified that after the divorce was final, he planned to save up money to buy his parents' house. Troutman testified that Warner's mother, who lived in El Paso, was not a suitable supervisor because most of the time when he and Warner were not

8

making good choices and doing illegal substances in El Paso, it "was with [Warner's] mother."

When asked if he had allowed Warner to see Lance unsupervised since December 2022, Troutman testified that he had allowed her to visit with Lance by agreement. When asked if such visits had occurred as recently as the Sunday before trial, Troutman testified that Warner had visited with Lance the Sunday before trial and Troutman and his parents supervised the visit. Warner's counsel then asked Troutman if he recalled the last time Warner had visited with Lance unsupervised, and Troutman testified that it was "Halloween night of last year." Troutman testified that he allowed Lance to go with Warner because Lance had been "begging to see his mom and wanted to go trick-or-treating" with Warner. Warner, who picked Lance up from school, brought him to Troutman's home later that night after they finished trick-or-treating.

Troutman testified that he was not alleging that Warner had ever abused Lance. He had, however, asked that Warner's ex-boyfriend James Chance Owen be enjoined from being around Lance, to which Warner agreed. When asked if he was alleging that anyone else besides Owen had abused Lance, Troutman testified, "I know one [of Warner's boyfriends] previously has. Jeff, for sure," and, according to Troutman, Jeff was "actually on there as a no contact, as well."

9

Troutman testified that the longest time Lance had been away from Warner prior to November 2021 was a "couple of weeks at a time." When asked if Lance had continuously lived with Warner before Troutman was given the exclusive right to determine Lance's primary residence, Troutman testified that Warner had possession of Lance "half the time" and Lance stayed with him "when I only had the extended standard possession order."

Troutman testified that Warner took a drug test in March 2023 and the test was negative. One condition of Warner's probation was that she stay away from drugs. Troutman admitted that he had allowed Warner to see Lance even though Warner had not registered with the Safe program, and when asked if he knew if a Safe Program existed in Galveston County, Troutman testified he did not know.

On redirect examination, Troutman testified that he allowed Warner to see Lance even though she had not enrolled in the Safe Visitation Program because "it isn't [Lance's] fault she didn't do it. He wanted to see his little brother," Jason. Troutman testified that he only allowed Lance to visit with Warner when he felt it was in Lance's best interest to see Warner. Troutman asked the court to order supervised visitation to "guarantee [Lance's] safety . . . and well-being."

According to Troutman, Lance lived with him "over three-quarters of the time" during which Warner had the exclusive right to designate Lance's primary residence.

**B.    Warner**

Warner testified that she lives in Galveston County with her son Jason, Margaret and Robert Watson, and the Watsons' 11- and 12-year-old grandsons. Warner, who has not had a full-time job in four years, cleans homes and takes care of the Watsons' grandsons when they get home from school. The Watsons are Jason's grandparents. Warner testified that she and Jason have been living in the Watsons' home since November 2022, and she can live with the Watsons for as long as she needs. Jason's father George is currently serving a six-year prison sentence and she takes Jason to the prison to visit George.

After Warner and Troutman broke up in 2021, Warner and Lance lived with Warner's friend Cindy, then Warner's friend Michelle, and then with Warner's friend Mary. After they lived with Mary, Warner and Lance moved in with Owen, Warner's boyfriend at the time. Warner testified that she started using drugs when she and Lance were living with Michelle, and Warner continued to use drugs after they moved in with Owen. According to Warner, she and Owen dated "last year" in 2022, and they used drugs "for a little bit." Warner was romantically involved with Owen when she was arrested for burglary of a building in March 2022. Evidence of Owen's criminal history, which was admitted into evidence, reflects that Owen was charged with over two dozen misdemeanor and felony charges between 1996 and March 2022. In December 2021, Owen was also charged with the felony offenses

11

burglary of a building and possession of a controlled substance. In March 2022, Owen was charged with six felony offenses, including four counts of felony burglary of a building, unlawful possession of a firearm by a felon, and "escape while arrested/confined."

Warner testified that she used methamphetamine for "maybe, six months," including the first two months of her pregnancy with Jason, but she stopped when she found out she was pregnant and "lost my kid -- lost custody of my kid [Lance]." Warner testified that she had not used drugs since December 15, 2021. When asked why she started using drugs, Warner testified that she was "hanging around the wrong people" and she might have been depressed. Warner testified that she and Troutman used cocaine when they were living in El Paso, but she was no longer using cocaine. According to Warner, her hair follicle drug screen in March 2023 was negative, and she felt she should not be subject to random drug testing because she had "changed [her] life."

In January 2023, Warner was placed on deferred adjudication community supervision for four years for the state jail felony offense of burglary of a building. The terms of her community supervision require Warner to complete 125 hours of community service, take a theft class, submit to random urinalysis testing, refrain from using illegal drugs and consuming alcohol, and pay probation and court costs.

Warner, who had been on probation in El Paso in 2012 for DWI, testified that she no longer drinks alcohol or uses illegal drugs.

According to Warner, Troutman started allowing her to have supervised visits with Lance a few months before trial and he had allowed Warner to pick Lance up from school twice. Warner testified that the visits occurred at Troutman's home and Troutman or one of his parents supervised the visits. Warner testified that she has a good relationship with Lance, and she did not believe that her visits needed to be supervised. According to Warner, she could be trusted to refrain from using illegal drugs because she had "changed [her] life." Warner testified that she had "been sober for almost two years" and she would not be committing thefts or burglaries in the future. Warner also denied leaving Lance with Troutman for weeks when she had custody of Lance, as Troutman had testified, and she claimed that the longest amount of time that she had voluntarily relinquished custody of Lance was one week.

On cross-examination, Warner testified that the April 11, 2022, and December 16, 2022 temporary orders were the two temporary orders in effect in this case. Warner testified that although the April 11, 2022 order entitled her to periods of supervised visitation with Lance, she never attempted to enroll in any type of supervised program. Warner testified that Troutman allowed her to visit with Lance on "multiple occasions" during the five or six months before trial, even though he

was not required to do so because she had not enrolled in the Safe Visitation Program.

Warner testified that she submitted to a hair follicle test and urinalysis in October 2021, and although her urine sample tested negative, her hair sample was positive for amphetamine and methamphetamine. Warner testified that she had not used methamphetamine or any other drug since December 15, 2021. Warner confirmed that she was sober when she was arrested and charged with three felony offenses in March 2022. Although she thought it was important for her to seek treatment for her drug use, Warner admitted that she had not enrolled in a drug treatment plan since she stopped using drugs. Warner testified that she had used drugs because she was depressed and the people around her at the time, but she had changed her life and was surrounding herself with better people who were not involved with drugs.

Warner was pregnant with Jason when she was arrested in March 2022. When asked if she had been concerned about the impact her criminal conduct could have on her pregnancy, Warner testified that she was concerned, but she did it anyway. Warner also testified that Jason's father, George, was in prison for drug-related charges. When asked if she had been in contact with George since he was sent to prison, Warner testified that she takes Jason to the prison to visit with George.

On redirect examination, Warner testified that she did not enroll in the Safe Visitation Program because Troutman "started letting me see [Lance] again." When asked why the trial court should believe she will not be around George when he is released from prison and go "back to doing inappropriate things," Warner testified, "[J]ust because I'm sober now and I'm not that person anymore."

On recross examination, Warner was asked,

[J]ust to clarify, you're telling this Court that you're a different person, that you're no longer using drugs; and you're asking the Court to believe that, despite while this case has been pending, you were charged with three felonies and tested positive for methamphetamine[.]"

Warner confirmed that she was.

## C.    **Margaret Watson**

Margaret Watson testified that her son George, Jason's father, is in prison for "drug-related problems." According to Watson, George and Warner have not lived in her home at the same time. Watson testified that she has not seen Warner using drugs since Warner moved into her home and she would never allow Warner to bring drugs into her home or use them there. Watson also denied ever inviting people into her home to use drugs.

After Watson's testimony concluded, the trial court asked the parties why they had agreed to enjoin Owen from being around Lance.[1] Troutman's counsel informed

---

[1]    The trial court stated that the previous hearings in the case were presided over the associate judge. Those hearings are not part of the appellate record.

the court that Owen was Warner's co-defendant in the three felony charges she incurred while the case had been pending. In response to the trial court's questioning, Troutman stated that he had moved twice within the previous two years, and he had lived with his parents for a year and a half. Warner told the trial court that she had moved five or six times within the last two years. She started dating George, Jason's father, after George was charged with his drug-related offenses.

The trial court made the followings findings on the record relating to Troutman's and Warner's possession of and access to Lance:

> All right. With regard to possession and access, . . . I'm going to adopt the possession schedule set forth in the default order on Petitioner's Motion to Modify Temporary Orders. That's filed in the Court's file on 4/11/22, except that: I'm going to order that periods of possession be supervised by either the SAFE Program or by Mr. Troutman or an adult designated to supervise on his behalf. And those visits are going to be beginning at noon on the Saturday following the first, third and fifth Friday. I'm going to end them at 3:00 o'clock on that same day. So I'm pretty much adopting that provision, but I'm going to extend it an hour and I'm going to say that they can be supervised -- possession and access can be supervised by either the SAFE Program or by Mr. Troutman or somebody that he is -- that he designates. All costs for the program bore -- by any supervising program bore by Ms. Warner. Any other periods of possession go to Mr. Troutman.

**D.    Post-Trial**

Warner filed "Respondent's Request for Findings in Possession Order" in which she stated that "a hearing was held [on April 26, 2023] to determine the periods of possession to be awarded to Respondent. Pursuant to Texas Family Code

16

§ 153.258, respondent requests that the Court state in the possession order the specific reasons for all deviations from the standard possession order."

On May 23, 2023, the trial court entered a Final Decree of Divorce and Order in Suit to Adjudicate Parentage.[2] The Final Decree appointed Troutman as Lance's sole managing conservator and Warner as Lance's possessory conservator. With regard to Troutman's and Warner's possession of and access to Lance, the decree deviated from the SPO by awarding Warner visitation on Saturdays following the first, third, and fifth Fridays of each month from 12:00 P.M. until 3:00 P.M., and from 12:00 P.M. until 3:00 P.M. on the day following Thanksgiving day of each year and on December 24th of each year, and requiring Warner's possessions of Lance to be supervised at all times by the Safe Program, Troutman, or an adult designated by Troutman. The Final Decree also required Warner to submit to random drug-testing and states that if Warner's hair follicle sample tests positive for any illegal substance, Warner's possession of and access to Lance will be suspended until she provides proof to Troutman that she has tested negative for illegal substances.

On May 30, 2023, Warner filed a formal request for findings of fact and conclusions of law pursuant to Texas Rules of Civil Procedure 296 and 297. On June 20, 2023, Warner filed a notice of past due findings. On July 14, 2023, Troutman filed proposed findings of fact and conclusions of law.

---

[2] The decree found that Troutman was not the father of Warner's other child, Jason.

17

On August 11, 2023, Warner filed her notice of appeal.

**Findings of Fact**

In her first issue, Warner argues the trial court erred in failing to make timely findings supporting its deviation from the SPO as required by Section 153.258 of the Texas Family Code. According to Warner, the trial court's failure to make the requested fact findings required her to "guess the reasons for the trial court's decision to award only supervised possession when such a limitation on her possession only came about after her criminal charges, which have been resolved," and to guess "why requiring supervised visitation does not exceed the least restrictive limitation required to protect the best interest of the child and is reasonably tailored to protect the child's best interest."

In her appellate brief, Warner requested that we abate the appeal and remand the case to allow the trial court to make the required fact findings. *See* TEX. FAM. CODE § 153.258(a) (stating "on request by a party, the court shall state in writing the specific reasons for the variance from the standard order" when possession contested and possession order deviates from standard possession order). Warner did not file a motion to abate prior to filing her appellate brief on December 14, 2023.

On January 17, 2024, the trial court entered Findings of Fact and Conclusions of Law in which it made the following fact findings in support of its decision to

18

appoint Troutman as Lance's sole managing conservator and Warner as Lance's possessory conservator:

> It is in the best interest of the child that [Troutman] be appointed the sole managing conservator of the child and that [Warner] be appointed the possessory conservator of the child.
>
> There is credible evidence of a history or pattern of past or present child neglect by [Warner] of [Lance], including but not limited to [Warner's] history and pattern of illegal drug use and [Warner's] criminal history. Accordingly, it is not in the best interest of the child that [Warner] be appointed as a joint managing conservator of [Lance]

The trial court made the following findings in support of its decision to deviate from the SPO, as required by Family Code Section 153.258:

1. [Warner's] history and pattern of illegal drug use, including but not limited to [Warner's] use of illegal drugs during the pendency of this case.

2. [Warner's] criminal history during the pendency of this case.

3. [Warner's] failure to exercise periods of possession during the pendency of this case, including but not limited to failing to register for supervised visitation pursuant to the terms of the temporary orders.

On February 15, 2024, Troutman filed his appellate brief in which he argued that Warner's first issue challenging the trial court's failure to make the fact findings required by Section 153.258 was moot because the trial court made such findings in its Findings of Fact and Conclusions of Law signed on January 17, 2024. Troutman

included a copy of the trial court's Findings of Fact and Conclusions of Law in the appendix to his brief. [3]

On March 11, 2024, Warner filed a reply brief in which she argued the trial court's untimely fact findings deprived her a "meaningful opportunity to review the findings or exercise her right to request additional or amended findings." Warner argued that we should reverse the judgment of the trial court and remand the case to the trial court for "further proceedings consistent with Section 153.258, or in the alternative, abate the case and permit appellant to exercise her right to request additional or amended findings pursuant to Rule 298."

## A.     Standard of Review and Applicable Law

Section 153.258 of the Family Code requires a trial court to "state in writing the specific reasons for the variance from the standard [possession] order[ ]" if requested by a party. TEX. FAM. CODE § 153.258(a) ("In all cases in which possession of a child by a parent is contested and the possession of the child varies from the standard possession order, . . . on request by a party, the court shall state in writing the specific reasons for the variance from the standard order."). A request

---

[3]     The trial court clerk subsequently filed a supplemental clerk's record containing the trial court's January 17, 2024 Findings of Fact and Conclusions of Law. *See* TEX. R. APP. P. 34.5(c)(3) ("Any supplemental clerk's record will be part of the appellate record.").

for findings of fact under this section must conform to the Texas Rules of Civil Procedure. *Id.* § 153.258(b); *see generally* TEX. R. CIV. P. 296–299a.

Under Rule of Civil Procedure 296, a request for findings of fact and conclusions of law shall be filed with the clerk of the trial court within twenty days after the trial court signs the judgment. TEX. R. CIV. P. 296. If the trial court does not file findings of facts within twenty days after the first request is filed, the requesting party has thirty days after the date it filed its original request to file a "Notice of Past Due Findings of Fact and Conclusions of Law." *Id.* 297. In the notice of past-due findings of fact, the party must state the date the original request was filed and the date the findings of fact were due. *Id.*

After the trial court files its findings of fact, any party may ask the trial court to make additional or amended findings if the party believes that the court's findings and conclusions are deficient in some way. *See id.* 298. A request for additional or amended findings of fact must be filed within ten days after the trial court files its original findings. *Id.* ("The request for these findings must be made within ten days after the court sends the original findings and conclusions."). The trial court "has no duty [to] make additional or amended findings that are unnecessary or contrary to its judgment; a trial court is only required to make additional findings and conclusions that are appropriate." *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 254 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

21

"The procedural rules establishing the time limits for the requesting and filing of findings of fact and conclusions of law do not preclude the trial court from issuing belated findings." *Robles v. Robles*, 965 S.W.2d 605, 610 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *see also Morrison v. Morrison*, 713 S.W.2d 377, 380 (Tex. App.—Dallas 1986, writ dism'd) (stating Rule 298 "does not preclude the trial court from issuing belated findings of fact; rather, it sets time limits for requesting and filing so that a litigant or trial judge may avoid the consequences of noncompliance"). If a trial court enters untimely findings of fact and conclusions of law, an appellant has a remedy only if the appellant shows harm and injury. *Robles*, 965 S.W.2d at 610 ("Unless they can show injury, litigants have no remedy if a trial court files untimely findings and conclusions."). An appellant is harmed if, because of the untimely findings, she was unable to request additional findings or was unable to properly present her appeal. *See id.*; *see also Clark v. Litchenburg*, No. 05-18-00278-CV, 2019 WL 4010771, at *7 (Tex. App.—Dallas Aug. 26, 2019, no pet.) (mem. op.) ("The general rule is that an appellant has been harmed if, under the circumstances of the case, he has to guess at the reasons the trial court ruled against him.").

## B. Analysis

Warner argues that the trial court's untimely fact findings left her with "no meaningful opportunity to review the findings or exercise her right to request

22

additional or amended findings." On the contrary, Warner filed her appellate brief on December 14, 2023, and Troutman's brief was due on February 15, 2024. Troutman had not filed his appellate brief when the trial court issued its fact findings on January 17, 2024.[4] Warner could have moved for leave to file an amended brief to address the trial court's specific findings or filed a motion to abate the appeal to allow her to file a request for additional or amended findings within 10 days of January 17, 2024. She did neither. *See* TEX. R. CIV. P. 298 ("The request for [additional or amended] findings must be made within ten days after the court sends the original findings and conclusions."). Instead, Warner waited until she filed her reply brief on March 11, 2024 to ask the court to abate the appeal to allow her to exercise her right to request additional or amended findings under Rule 298. Notably, Warner has not explained why the court's findings and conclusions are deficient or identified which, if any, additional or amended findings she believes are necessary. *See id*. Nor has she explained why she did not file her requests for additional or amended findings in the trial court within 10 days of the court's filed findings on January 17, 2024.

Although Warner argues that the trial court's failure to enter timely findings prevented her from adequately presenting her argument on appeal because she was

---

[4]  Troutman's brief was originally due on January 16, 2024. On January 12, 2024, Troutman filed a motion for an extension of time to file his brief. We granted the motion ordering that Troutman file his brief on February 15, 2024.

forced to guess the trial court's reasons for deviating from the SPO, the record shows that Warner was able to properly present her appellate arguments for this court's analysis. The primary focus of the one-day bench trial was on Warner's history of illegal drug use, criminal conduct, and to a lesser extent, the circumstances surrounding periods of possession of Lance during the pendency of the case. In its findings of fact, the trial court stated that it deviated from the SPO because of (1) Warner's "history and pattern of illegal drug use, including but not limited to [Warner's] use of illegal drugs during the pendency of this case," (2) Warner's "criminal history during the pendency of this case," and (3) Warner's "failure to exercise periods of possession during the pendency of this case, including but not limited to failing to register for supervised visitation pursuant to the terms of the temporary orders."

Warner's briefing addresses all three of the trial court's stated reasons for deviating from the SPO. In her opening brief, Warner argues that the trial court abused its discretion by ordering that her periods of possession be supervised by the Safe Visits Program, Troutman, or Troutman's designee because she is no longer using drugs or alcohol, or living a criminal lifestyle, and thus, this restriction on her right to possession exceeds the level of restriction required to protect Lance's best interest, and she addressed the trial court's third reason for deviating from the SPO in her reply brief.

Based on the record before us, we conclude that Warner has not shown she was harmed by the trial court's belated fact findings because she was able to address in her briefing the trial court's three reasons for deviating from the SPO, and although Warner argues that she was deprived of the opportunity to request additional or amended findings, she has not identified which, if any, additional or amended findings she wanted to request but was unable to do so, nor has she explained why the trial court's findings are deficient. We thus conclude that the trial court's failure to file its findings and conclusions timely was harmless. *See* TEX. R. APP. P. 44.1(a); *Robles*, 965 S.W.2d at 611.

We overrule Warner's first issue.

## Periods of Possession

In her second issue, Warner argues that the trial court abused its discretion by requiring that her periods of possession be supervised continuously by the Safe Program, Troutman, or an adult designated by Troutman because this limitation exceeds the level of restriction necessary to protect Lance's interests.[5] *See* TEX. FAM. CODE § 153.193 ("The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest

---

[5]     Warner is only challenging the visitation requirement. She is not challenging any other variations from the SPO.

25

of the child."). Warner argues she is no longer using drugs or alcohol or living a criminal lifestyle.

Troutman responds that the trial court did not abuse its discretion by requiring that Warner's periods of possession of Lance be supervised because there is evidence of a substantive and probative character supporting the trial court's order, including evidence of Warner's history of illegal drug use, criminal conduct during the pendency of the case while her rights to possession of and access to Lance were at stake, and her minimal involvement in Lance's life after she lost primary custody.

## A.    Standard of Review

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."  TEX. FAM. CODE § 153.002.  A trial court has wide discretion to determine the best interest of the child when establishing terms and conditions of conservatorship. *See In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021); *see also Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (stating trial court has "wide latitude" in determining child's best interest and may impose any conditions it finds necessary to protect child's best interest); *In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 80 (Tex. App.—San Antonio 2011, pet. denied) (stating "a trial court is in the best position to observe the witnesses and their demeanor, and therefore is given great latitude in determining a child's best interests").  The trial court's

26

judgment will be reversed only when it appears from the record as a whole that the court has abused its discretion. *Gillespie*, 644 S.W.2d at 451. A trial court abuses its discretion when it acts "without reference to any guiding rules or principles; or in other words, [when it acts] arbitrarily or unreasonably." *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

Under the abuse of discretion standard, challenges to the legal or factual sufficiency of the evidence are not independent grounds of error but are relevant considerations in assessing whether the trial court abused its discretion. *In re R.T.K.*, 324 S.W.3d 896, 899–900 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). "A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support its decision." *Id.* at 900.

The Family Code contains SPOs which "set[] the minimum possessory rights of the parent who does not have the right to establish the child's primary residence." *Kazmi*, 2023 WL 7932473, at *12; *see generally* TEX. FAM. CODE §§ 153.3101–.3171 (codifying terms and requirements associated with SPOs); *see generally also id.* § 153.316 (setting forth general terms and conditions for SPOs). "The guidelines established in the standard possession order are intended to guide the courts in ordering the terms and conditions for possession of a child by a parent named as a possessory conservator[.]" TEX. FAM. CODE § 153.251(a).

While a trial court is given wide latitude in determining issues pertaining to possession and access, there is a rebuttable presumption that the SPO (1) provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator; and (2) is in the best interest of the child. *Id.* § 153.252. The trial court may deviate from the SPO, however, if there is sufficient evidence to rebut the presumption. *See In re N.P.M.*, 509 S.W.3d 560, 564 (Tex. App.—El Paso 2016, no pet.). When deciding whether to deviate from the SPO, the trial court may consider (1) the age, developmental status, circumstances, needs, and best interest of the child, (2) the circumstances of the managing conservator and of the parent named as a possessory conservator, and (3) any other relevant factor. TEX. FAM. CODE § 153.256.

Although trial courts have broad discretion to issue orders restricting a parent's right to possession of or access to a child, the trial court's order may not impose restrictions beyond those required to protect the child's best interest. *See id.* § 153.193 ("The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child."). A trial court does not abuse its discretion in restricting a parent's possession and access when the record contains evidence to support a finding that such restrictions are in the children's best interest. *In re Marriage of Harrison*, 557 S.W.3d 99, 131

(Tex. App.—Houston [14th Dist.] 2018, pet. denied); *In re P.A.C.*, 498 S.W.3d 210, 219 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Among other deviations from the SPO, trial courts may "place conditions on a parent's access, such as supervised visitation, if necessary for the child's best interest." *In re A.J.I.L.*, No. 14-16-00350-CV, 2016 WL 6110450, at *5 (Tex. App.—Houston [14th Dist.] Oct. 18, 2016, pet. denied) (mem. op.); *see also Hinojosa v. Hinojosa*, No. 14–11–00989–CV, 2013 WL 1437718, at *6 (Tex. App.– Houston [14th Dist.] Apr. 9, 2013, no pet.) (mem. op.) ("[A] trial court is permitted to place conditions on a parent's access, such as supervised visitation, if necessary for the child's best interest . . . ."). If the trial court deviates from the SPO and orders less visitation than the guidelines require, it shall, upon timely request, "state in writing the specific reasons for the variance from the standard order." TEX. FAM. CODE § 153.258(a).

Best interest determinations in the conservatorship context are reviewed using the factors the Texas Supreme Court identified in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976). *V.M. v. Tex. Dep't of Family & Protective Servs.*, 681 S.W.3d 465, 474 (Tex. App.—Austin 2023, no pet.) ("Just as in a termination determination, best interest determinations in the conservatorship context are reviewed in connection with the non-exhaustive factors set out in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976)."). The *Holley* factors include (1) the desires of the child, (2) the emotional

29

and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72. This is not an exhaustive list, and a court need not have evidence on every factor listed to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

As ultimate fact finder in a bench trial, it is the province of the trial court to access witness credibility and the weight to give their testimony and resolve any conflicts in evidence. *See Coleman v. Coleman*, 109 S.W.3d 108, 111 (Tex. App.—Austin 2003, no pet.). The trial court is in a better position having faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent. *See In re S.N.Z.*, 421 S.W.3d 899, 909 (Tex. App.—Dallas 2014, pet. denied); *Coleman*, 109 S.W.3d at 111. "We remain mindful that the trial judge is best able to observe and assess the witnesses' demeanor and credibility, and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re A.L.E.*, 279 S.W.3d at 427 (quoting

30

*Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.)). "We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province." *In re A.B.*, 412 S.W.3d 588, 592 (Tex. App.–Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014) (citing *In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005)). We defer to the fact finder's determinations so long as they are not unreasonable. *In re A.B.*, 412 S.W.3d at 592.

## B.    Analysis

Warner argues that the supervised visitation requirement, which was included in the temporary orders after she tested positive for amphetamine and methamphetamine and was arrested and charged with three felony offenses, exceeds the level of restriction necessary to protect Lance's best interest because she is no longer drinking alcohol, using illegal drugs, or engaging in criminal conduct, and the three felony criminal charges filed against her during the pendency of the case have been "resolved." *See* TEX. FAM. CODE § 153.193 ("The terms of an order that denies possession of a child to a parent or imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child."). In other words, Warner contends that supervised visitation is no longer necessary to protect Lance's best interest because the circumstances that led to the imposition of this restriction on her rights of possession no longer exist.

The trial court made the following findings in support of its decision to deviate from the SPO:

1. [Warner's] history and pattern of illegal drug use, including but not limited to [Warner's] use of illegal drugs during the pendency of this case.

2. [Warner's] criminal history during the pendency of this case.

3. [Warner's] failure to exercise periods of possession during the pendency of this case, including but not limited to failing to register for supervised visitation pursuant to the terms of the temporary orders.

Lance was four years old in March 2021 when Troutman filed his petition for divorce and related suit affecting the parent-child relationship to determine Troutman's and Warner's rights of possession of and access to Lance. Troutman and Warner initially agreed that Warner would have the right to designate Lance's primary residence. Lance lived with Warner from March 2021 until late November 2021. During those eight months, Warner and Lance lived with at least three of Warner's friends and Warner's boyfriend Owen, who has an extensive criminal history spanning two decades, including charges for possession of a controlled substance and possession of drug paraphernalia. Warner admitted that she used illegal drugs, including methamphetamine, while Lance was in her care, including during the first two months of her pregnancy with Jason. Warner, who admitted to using drugs with Owen, tested positive for amphetamine and methamphetamine in

October 2021. In late November 2021, Lance was removed from Warner's care at least in part because of Warner's positive drug test.

Warner's use of methamphetamine while she was living with and caring for Lance endangered Lance's physical and emotional wellbeing because it exposed him to the risk that Warner would be impaired or possibly incarcerated, thus causing her to be absent from his life, and thus supports the trial court's finding that supervised visitation was necessary to protect Lance's best interest. *See In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (stating parent's substance abuse endangers children's physical and emotional wellbeing because it exposes children to parent's risk of impairment and incarceration); *see also Holley*, 544 S.W.2d at 372 (identifying present and future emotional and physical danger to child as best interest factor). Warner's illegal drug use, especially during the pendency of the SAPCR proceeding in which her rights to possession of and access to Lance were in question and while she was pregnant with Jason, also indicate that Warner exercised poor judgment with regard to the wellbeing of her young children, and also supports the trial court's best interest finding. *See Holley*, 544 S.W.2d at 372 (identifying as best interest factors parental abilities of individuals seeking custody); *In re B.L.H.*, 609 S.W.3d 271, 281 (Tex. App.—Texarkana 2020, pet. denied) (stating parent's "use of drugs during the pendency of the case . . . demonstrated a lack of parental abilities"); *see also In re M.C.*, 482 S.W.3d 675, 688

(Tex. App.—Texarkana 2016, pet. denied) ("Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest.").

In addition to her illegal drug use, Warner also engaged in criminal conduct during the pendency of the case which resulted in her being arrested and charged with three felony offenses in March 2022, only three months after Lance was removed from her care. Warner's decision to engage in criminal activities, especially while the SAPCR was pending and after Lance had been removed from her care as a direct consequence of her actions, supports the trial court's best interest finding because such conduct not only endangered Lance, but it reflects Warner's poor judgment. *See In re S.G.A.R.*, No. 01-18-00291-CV, 2018 WL 4705835, at *6 (Tex. App.—Houston [1st Dist.] Oct. 2, 2018, pet. denied) (mem. op.) (stating "parental substance abuse and past criminal conduct demonstrate poor judgment, which brings into question the parent's ability to provide adequate care for the child" and "[t]hese behaviors also show a greater likelihood that the parent will be impaired or imprisoned, and thus incapable of parenting"); *see also In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (stating evidence of parent's inability to maintain lifestyle free from arrests and incarcerations is relevant to best-interest determination); *see also In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *7 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.) (stating

34

child is subjected "to ongoing uncertainty regarding who will take care of him" when "parent repeatedly commits criminal acts that subject the parent to incarceration"). Warner testified that she was pregnant with Jason when she was arrested, and although she knew her criminal conduct posed a risk to her pregnancy, she did it anyway. This evidence, too, indicates that Warner exercised poor judgment in caring for her young, vulnerable children, and thus supports the trial court's finding. *See In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.) (parent's poor judgment may be considered in determining child's best interest).

Contrary to Warner's argument, the record does not reflect that the three felony charges she incurred while the SAPCR was pending were "resolved." The record reflects that one of the felony charges against Warner was "dropped," and in January 2023, Warner pleaded guilty to the state jail felony offense of burglary of a building and received four years of deferred adjudication community supervision. Under the terms of her community supervision, Warner must submit to random drug testing and refrain from using illegal drugs or consuming alcohol. If Warner tests positive for illegal substances or otherwise violates the terms of her community supervision during the four-year supervisory period, she is subject to having her community supervision revoked, being adjudicated guilty of the underlying state jail felony offense, and sentenced to a period of confinement. *See* TEX. PENAL CODE § 30.02(c)(1) (stating burglary of building is state jail felony); *id.* § 12.35 (stating

35

individual adjudged guilty of state jail felony "shall be punished by confinement in a state jail for any term of not more than two years or less than 180 days" and "may be punished by a fine not to exceed $10,000"). The fact that Warner is serving four years of community supervision for a felony offense thus endangers Lance's physical and emotional well-being because it subjects Lance to a life of uncertainty and instability. *See In re E.C.*, 2020 WL 2071755, at \*7 (stating child is subjected "to ongoing uncertainty regarding who will take care of him" when "parent repeatedly commits criminal acts that subject the parent to incarceration"); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) (stating "[a]s a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child").

Warner testified that she had been sober since December 15, 2021, she was no longer using drugs or consuming alcohol, and she could be trusted not to use drugs again because she had changed her life and she was no longer associating with people who used drugs. She denied that her mother used drugs and testified that neither she nor anyone else used drugs in the Watsons' home. Warner, however, also testified that she remained in contact with George, who was serving time in prison for a drug-related offense, and she lived with George's parents, the Watsons. When asked "why should the Court believe that if [George] gets out [of prison], that you wouldn't be around him and going back to doing inappropriate things, seeing

36

that you're visiting him in the prison," Warner testified, "Right, just because I'm sober now and I'm not that person anymore."

Troutman testified that he was concerned Warner would start using drugs again because she tested positive for amphetamines and methamphetamine while the case was pending, and she has a history and pattern of using methamphetamine or amphetamines. He testified that Warner, who had not sought rehabilitation therapy for her drug use, had not been clean and sober for a sufficient time to alleviate his concerns that she would relapse. Troutman asked the court to order that Warner's periods of possession be supervised because he wanted "a little bit longer period of time of proof that she's been clean off of any type of drugs and that she has a stable job and stable home guaranteed for [Lance]." He was also concerned that Warner planned to move back to El Paso because she would be "back around people that we both know are still using drugs," including her mother, who Troutman claimed had used cocaine with him and Warner when they lived in El Paso. He was also concerned about the appropriateness and safety of the Watsons' home for Lance because Troutman knew people who had used drugs in the Watsons' home.

As the ultimate fact finder, it was the trial court's province to disbelieve Warner's testimony that she would not start using illegal drugs again, commit criminal offenses, or associate with the type of people she had been around when she was using drugs if she was allowed to have unsupervised visitations with Lance,

37

especially based on Warner's history of drug use, her continued contact with George, and her plan to move to El Paso where her mother lived. *See Coleman*, 109 S.W.3d at 111 (stating trial court, as ultimate fact finder, weighs witness credibility issues and resolves any conflicts in evidence); *see also In re A.P.S.*, 54 S.W.3d 493, 497 (Tex. App.—Texarkana 2001, no pet.) ("[T]he trial court has wide discretion in judging credibility because it observes the parties' testimonies first hand and is in a better position than the appellate court to judge sincerity and honesty."); *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.) (stating trial court is in best position to "observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record").

Although Warner denied that her mother used drugs, and Warner and Watson testified that the Watsons' home was drug-free, it was within the trial court's province, as the sole arbiter of a witness' credibility and the weight to give the witness' testimony, to resolve any conflicts in the evidence in favor of Troutman. *See Coleman*, 109 S.W.3d at 111 (stating trial court, as ultimate fact finder, weighs witness credibility issues and resolves any conflicts in evidence). Similarly, although Warner testified that she had changed her life after Lance was removed from her care, Troutman testified that he had not seen any changes in Warner's circumstances that would alleviate his concerns about Warner relapsing and using

38

methamphetamine in the future, and it was within the trial court's province to resolve any conflicts in the evidence in favor of Troutman. *See id.*

In her reply brief, Warner argues that the Final Decree's requirement that her periods of possession be supervised effectively denies her any possession of or access to Lance because there is no evidence there is a "'SAFE' program in Galveston County or that appellee has designated any adult to be a supervisor." The Final Decree, however, requires Warner's visits with Lance to be supervised by the Safe Program, Troutman, or an adult designated by Troutman. Warner testified that Troutman or one of his parents had supervised her visits with Lance during the five or six months prior to trial, and there is no evidence that Troutman is unwilling or unable to supervise Warner's visits with Lance in the future or designate one of his parents to supervise the visits. The trial court's restrictions on Warner's possession of and access to Lance are thus not so restrictive or indefinite as to constitute a denial of access and possession. *See generally Malekzadeh v. Malekzadeh*, No. 14-05-00113-CV, 2007 WL 1892233 at *16 (Tex. App.—Houston [14th Dist.] July 3, 2007, pet. denied) (mem. op.) ("[W]e note that by restricting appellant's visitation with and possession of the child, the trial court has not denied appellant his rights as parent." (citation & internal quotation marks omitted)). *Cf. In re Lemons*, 47 S.W.3d 202, 206 (Tex. App.—Beaumont 2001, orig. proceeding) (holding unenforceable temporary order effectively denied visitation to father).

Evidence of Warner's poor judgment during the pendency of the case, including her history of illegal drug use and criminal conduct while her rights to Lance were in jeopardy, constitutes evidence of a substantive and probative character that supports the trial court's decision to require supervised visitation. Based on this record, we conclude that the trial court reasonably could have concluded that requiring Warner's periods of possession to be supervised was still necessary to protect Lance's best interests. *See In re H.D.C.*, 474 S.W.3d at 764 (stating that trial court abuses its discretion if it imposes restrictions on possession and access that exceed those required to protect children's best interests, but court does not abuse its discretion if evidence in record supports finding that restriction is in children's best interest). Because some evidence of a substantive and probative character supports the trial court's decision to require supervised visitation, the trial court did not abuse its discretion by ordering that Warner's periods of possession of Lance be supervised by the Safe Program, Troutman, or an adult designated by Troutman. *See In re P.A.C.*, 498 S.W.3d at 220.

We overrule Warner's second issue.

## Conclusion

We affirm the trial court's decree.

Veronica Rivas-Molloy
Justice


Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.